[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The parties were married in New York City on November 21, 1984. They have been living separate and apart for approximately three years. Two children have been born to the plaintiff wife ("wife") since the date of the marriage, John L. Loeffler, born May 31, 1988, and Kylie M. Loeffler, born April 13, 1993. The children reside with their mother in a rental home in Greenwich, Connecticut. The lease is for a term of one year. Their son is in 7th grade at the Brunswick School, and their daughter is in 2nd grade in the public school system. The husband divides his time between New York City and the couple's weekend home on Long Island. The father sees the children on a regular basis, but it is the wife who is clearly the primary care giver.
The wife is 36 years old and in apparent good health. She left high school in Florida at the age of fifteen to take up a modeling career and ultimately signed with the Ford Modeling Agency in New York. She has since received her G.E.D., but she has had no further formal education. She lived for a time with the couple who ran the Ford Modeling Agency and then at age 16 left to find an apartment on her own. Sometime after that CT Page 3132-ap she met the defendant husband ("husband") and struck up a relationship. By age 18 or 19 she had moved into the husband's apartment, a loft on 22nd Street. She described their lifestyle variously as "funky, casual, and thrifty," and as "not upscale." At that time, he drove an "old blue Mercedes." Furthermore, she testified that since he never discussed finances with her, she had no idea of the husband's assets. The wife's modeling career eventually soared for quite a number of years, and she was at one point making well in excess in of $150,000 a year. According to her testimony after their marriage, all of her earnings were turned over to her husband who was in total control of the family finances, and "he started to save for their future." She had no input regarding the finances, except that he did discuss the purchase of their first home.
In 1992/93 the wife became the "creative partner" in a children's furniture store in New York called "Portico Kids," which opened a branch in Greenwich in 1994, however, this venture proved unsuccessful. There is the remote possibility that a portion of the receivables, amounting to $47,000, will come back to her. Other than her duties as a full time mother to the two children, her failed retail venture, and her modeling, she has had no other significant work experience. She has hopes of resuming a modeling and/or acting career, however, nothing has come of it to date.
The husband is 49 years old and also apparently in good health. He earns his living as the Chairman Emeritus of Paradise Music and President of its subsidiary, John Loeffier Music, Inc. His base salary before a bonus is $325,000 per year. Unlike the wife, the husband does have a Bachelor's degree from Williams College. He is extremely talented and has parlayed that talent into a very successful career in the entertainment business not only as a composer but also as an entrepreneur. Following graduation, he began that career as a songwriter for Sherman Cahn for $15,000 per year. Later on, in 1978, he began work as a music director for Grey Advertising. When the parties first met, he was waiting tables and writing songs and commercial jingles part-time for Grey Advertising in New York. He continued to work for Grey until July of 1999. In the meantime, he formed John Loeffler Music, Inc. around 1986/87. It eventually became, in his words, an "umbrella" which combined various aspects of the business from composition to production. Sometime in 1997 he sold his firm to Paradise Music which is traded on the NASDAQ Exchange. He worked two years on the project to take the company public, and this effort alone added considerable strain to the marriage. At that time, he received 300,000 shares of the parent corporation. About eighteen months ago he was removed as Chairman and C.E.O. as the result CT Page 3132-aq of a power struggle within the organization. He currently shares an apartment in New York with his significant other.
During their testimony, the parties have each painted a different picture of their early married years. The wife described a Spartan, Bohemian-like existence where their assets were pooled and they lived in a Manhattan loft apartment. The husband testified that even before their marriage he had amassed capital and made investments in several projects, including a restaurant and an apartment. At some point, success struck and their lifestyle changed drastically. In 1987, they used $175,000 of marital funds and a mortgage for the balance in order to purchase a cooperative apartment at the San Remo in New York for $850,000. The wife testified that the lender extended credit in large measure based upon the strength of her contract with Almay Cosmetics. They lived there for about three years, when the unit was sold and they purchased a home in Greenwich, Connecticut. This, in turn, was sold during the pendency of the current proceedings. From the net proceeds, each party took $100,000, while the balance is being held in escrow.
In 1989 the parties acquired what was described as a "fixer upper" home at 245 Narrow Lane in Sagaponack, New York, for approximately $500,000, and which has a current value of $1,700,000. Every weekend they lavished both their money and their sweat upon it. The parties testified that the husband concentrated on the exterior of the house and the landscaping, while the wife concentrated on furnishing and decorating the interior. The house was rented last August for $30,000-$35,000. The husband would like to keep the home which he describes as his "oasis." The wife would like it sold and the proceeds divided so that she can buy a house for herself and the children, preferably in Greenwich. There is a right of first refusal in a third party.
The parties entertained New York friends over weekends at their Long Island residence, however, the wife testified that once their son was born she found the lifestyle to be increasingly less to her liking. She testified that by 1990/91 she was "burned out" by the constant entertaining, and described herself as becoming a "nester." It was then she first asked for a divorce. The wife made the observation that during their marriage, the husband "was not truthful or exaggerated about insignificant things." The husband, on the other hand, seemed energized by the glitter and glitz, and even admitted during his testimony that he was "self-absorbed." He considers entertaining (or in his words "socializing") an integral part of his business. Prior to the present action, the parties filed for divorce and then withdrew the action in 1991 and considered it again in 1997. The husband admitted to having at CT Page 3132-ar least one sexual encounter during the marriage, and each admitted to various dating relationships with other persons following their first separation in 1991. Throughout the present proceedings the parties have maintained an unusual degree of cordiality, and the court has drawn the obvious conclusion that they still have a great deal of affection for one another. The wife testified that the husband was very controlling and that she always deferred to him. She still does. At numerous times during the proceedings, while the wife was testifying, she would look to her husband for the answer to the inquiry. As with anything in life, it is all about choices about what is important to us. However, after two days of testimony this court feels that, the husband would do well to consider his choices in light of those made by the well known 19th Century Irish songwriter who placed love above looks and created a sentimental masterpiece which will be sung long after the strains of the "Pokemon" theme fade from our collective memories.[1]
 FINDINGS
The court, having heard the testimony of both parties, and having considered the evidence presented at hearing, including expert testimony regarding the value of the New York real property, as well as the factors enumerated in Sections 46b-56, 46b-81, 46b-82, 46b-84, and 46b-215a of the Connecticut General Statutes, including the Child Support and Arrearage Guidelines Regulations, hereby makes the following findings:
1. That it has jurisdiction.
 2. That the allegations of the complaint as amended to reflect the correct birth dates of the minor children are proven and true.
 3. That the marriage of the parties has broken down irretrievably, and that ample evidence exists that both parties have contributed equally to said breakdown.
 4. That both parties maintain a warm and loving relationship with the minor children; that the wife is the primary care giver; that the husband has regular and ongoing visitation with the children; and that it is in the best interest of the minor children that he continues to have some input in the major decisions affecting their lives. CT Page 3132-as
 5. That the husband's net income exceeds the maximum guideline amount, and that the presumptive minimum weekly child support would be $566.00, but that, in light of the orders of this court, it would be equitable and appropriate to deviate from the Child Support Guidelines in one or more respects based upon coordination of total family support [Section 46b-215a-3 (b)(5)]as well as the best interest of the minor children and other equitable factors [Section 46b-215a-3 (b)(6)].
 6. That the wife's earning capacity is severely limited by her lack of formal education beyond the high school level, a dearth of recent work experience outside the home, and the importance of her role as homemaker and mother to the two minor children, and the fact that she is, as well, at the mercy of the often arbitrary vagaries of the youth-oriented commercial and entertainment markets in seeking to, once again, take advantage of her still luminous and wholesome beauty as a model or entertainer; and that it would be equitable and appropriate to award to her lifetime alimony as well as a larger share of the principal marital assets. Porter v. Porter, 61 Conn. App. 791, 797-98 (2001).
 7. That the wife's financial contributions to the marriage, in particular, during the early years, were substantial and in excess of the husband's financial contributions during that period, and formed the basis for much of the currently accumulated assets of the parties; that in addition, those contributions afforded the husband the opportunity to pursue his talents and dreams which were ultimately successful; and that having heard the testimony of both parties, and there being no credible documentary evidence offered by the husband, other than with regard to his pension at Grey Advertising, the court finds the wife's testimony to be more credible with regard to the assets that the husband claims to have brought to the marriage and invested in CT Page 3132-at marital assets; and that, in particular, as to the investment in a cooperative apartment at the San Remo in New York, and the investment in Hawaii, each was brought about after the marriage of the parties, and in large measure with the income and/or considerable earning capacity of the wife, as well as savings generated in part by her earnings.
 8. That the expert testimony and report of the witness for the wife was more credible, and that the fair market value of the jointly owned real estate at 245 Narrow Lane, Sagaponack, New York, is $1,700,000, and that there are mortgages totaling $410,000 leaving an equity of $1,290,000.
 9. That the attorney's fees incurred by the wife are fair and reasonable under the circumstances; that to require the wife, who has minimal earning capacity and the responsibility for the two minor children, to pay these fees from her portion of the marital assets awarded to her by virtue of this Memorandum of Decision would undermine the purposes of same; and that it would be fair and equitable for the husband to pay a portion of same.
 10. That on or about February 2000, the parties each received the sum of $100,000, which represented a portion of the proceeds from the sale of their Greenwich residence, and that through poor investment advice, the wife lost most of her share; and that her loss claim is currently under arbitration; and that these factors should be taken into consideration in arriving at an equitable distribution of marital assets.
 11. That, with the exception of the husband's retirement assets from Grey Advertising, a portion of which accrued prior to marriage, in determining the coverture fraction of the retirement assets of the parties, it would be equitable and appropriate to treat all funds as CT Page 3132-au having accrued subsequent to the date of the marriage; and that as to the Grey Advertising retirement assets, the court finds that it would be equitable and appropriate to consider 2/3rds as the marital share.
 ORDER
IT IS HEREBY ORDERED THAT:
 1. The marriage of the parties is hereby dissolved, and they are each hereby declared to be single and unmarried.
 2. The parties shall have joint legal custody of the minor children, JOHN LUCAS LOEFFLER, born May 31, 1988, and KYLIE MARIE LOEFFLER, born April 13, 1993. The primary physical custody of the minor children shall be with the wife, subject to the reasonable, liberal and flexible visitation rights of the husband. Initial visitation with the husband shall include, but not be limited to at least one weekday visit (Monday through Thursday) and every other weekend from Friday evening through Sunday evening, and at such other times as the parties may agree. In addition, the parties shall share holidays and school vacations, including Christmas Eve and Christmas Day, as well as the summer vacation, as nearly equally as may be practicable, or as they may otherwise agree, so as to allow each parent the opportunity to spend significant quality time with their children. The parties shall consult with one another concerning all major issues involving the minor children, including but not limited to, health, education, and religious affiliation and training. In the event that parties are unable to agree upon any issue regarding custody and/or appropriate visitation, they shall first bring the matter to the Family Relations Office for mediation prior to a determination by the court.
 3. Commencing March 1, 2001, and monthly thereafter, the husband shall pay to the wife the sum of $12,500.00 as and for unallocated alimony and child support, until the death of either party or the remarriage of the wife, whichever shall sooner occur. The foregoing notwithstanding, if the husband's obligation to pay alimony has not terminated at the time that he reaches age 65, then, in that event, the husband may, at his option, ask the court to review the alimony award in light of each party's circumstances then prevailing. It is the intention of this order that these sums CT Page 3132-av shall be treated as taxable income to the wife and deductible by the husband.
 4. In the event that the alimony shall terminate and either or both children are unemancipated minors and eligible for support, the husband shall pay to the wife as and for child support, a sum of money in accordance with the Child Support Guidelines then in effect or as a court may otherwise order, until such time as the oldest child shall reach the age of eighteen years, at which time child support for the remaining child shall be adjusted in accordance with the then existing Child Support Guidelines or as a court may otherwise order. The foregoing notwithstanding, if any child shall turn eighteen years old and is still in high school, then, in that event, the child support shall continue until the first day of next month following graduation from high school or their nineteenth birthday, whichever shall sooner occur, pursuant to Section 46b-84 (b) C.G.S.
 5. In addition to the sums set forth above, as and for additional child support, the husband shall contribute to the private school education of each of the minor children up to and including high school, an amount not to exceed $20,000 per year per child. Any sums in excess of this amount shall be divided by the parties 25% to the husband and 75% to the wife. Furthermore, the husband shall contribute to summer camp for each of the children up to and including the summer prior to their senior year of high school in an amount not to exceed $5,000 per year per child, and any sums in excess of this amount shall be divided by the 25% to the husband and 75% to the wife.
 6. The husband shall have exclusive possession of the jointly owned real estate located at 245 Narrow Lane, Sagaponack, New York, subject to any existing indebtedness, and he shall be responsible for the payment of all mortgages, liens, taxes, and insurance, and shall indemnify and hold the wife harmless from any further liability thereunder. Except as otherwise set forth in this order, the parties shall list same for sale no later than September 1, 2001, with a mutually acceptable broker who is a member of the Multiple Listing Service or other similar organization, familiar with real estate values in the Sagaponack area, at a mutually agreed upon listing price. If the parties are unable to agree upon a listing price, each shall choose a broker who, in turn shall pick third broker, and the listing price shall be the average of all three brokers. Unless the parties shall CT Page 3132-aw otherwise agree, they shall accept any bona fide offer without unusual conditions, which is within 3% of the listing price. Upon sale of the property, from the proceeds shall be paid the customary and ordinary costs associated with a sale of real estate, including broker and attorney fees, conveyance taxes, fix-up expenses, and any mortgages and liens. After the payment of these sums, the net proceeds shall be divided 60% to the wife and 40% to the husband.
The foregoing notwithstanding, prior to listing of the property for sale, the husband shall have the exclusive right to purchase the wife's share of the real property for the sum of $774,000[2] He must give notice in writing to the wife on or before May 1, 2001, that he intends to purchase her interest in the real property, and he must be prepared to close title within ninety (90) days of his notice to the wife of his intention to purchase. In order to take advantage of this provision, the husband must pay to the wife a minimum $500,000 in cash with the balance by means of a simple promissory note (payable her no later than five (5) years from date) and containing the usual language regarding the payment of reasonable attorneys fees and costs in the event of his default. Said promissory note shall carry simple interest at the rate of eight (8%) percent per annum payable no less than quarterly thereafter until paid in full, and it shall be secured by a mortgage deed. Both the deed and note shall be executed simultaneously with the delivery of the Quit Claim Deed to the husband. In addition, the husband shall use his best efforts to refinance the existing mortgage and home equity line within five (5) years from the date of this Memorandum of Decision. The wife shall, in turn, transfer her interest in the real estate to the husband by means of a fully executed Quit Claim Deed together with a completed conveyance tax form. Upon transfer of title, the husband shall be liable for all outstanding mortgages, liens, and taxes, which he assumes and for which he shall indemnify and hold the wife harmless from any further liability therefrom.
In the event that the husband fails to give the wife notice of his intention to purchase on or before May 1, 2001, then, in that event, the wife shall have the right to offer the property for sale to Nancy Dunlop for a price no lower than $1,700,000, with no unusual terms and conditions, and that sale must take place no later than August 31, 2001. The parties shall divide the net proceeds as set forth above.
While he occupies same, the husband shall have the sole responsibility for repairs costing $250 or less. Both parties shall share the cost of any maintenance, repairs, or replacements in excess of $250 in the same CT Page 3132-ax proportion as their share of the net proceeds. Either party may advance the full cost of same and an adjustment shall be made at time of sale or transfer. Neither party shall further encumber the property nor draw on any home equity without the agreement of the other. The court shall retain jurisdiction with regard to any conflicts arising out of this issue.
Until the sale of the property, any rental income shall be divided equally by the parties after deducting any real estate commissions.
7. Personal property shall be divided as follows:
A. The children's furniture shall remain in the wife's residence.
 B. The home furnishings (other than the children's furniture) shall be divided as follows: The personal property, artwork, and furnishings currently in the wife's residence shall belong to the wife, and the similar property now at the husband's residence at Sagaponack, New York, including the grand piano, shall belong to the husband, with the exception of the following items which shall become the sole property of the wife: master bed, main cottage guest bed, pine breakfront, Barlow-T lawn chairs, green patio furniture, plaintiff's dresser, blue writing table, the pine armoire from downstairs guestroom, and armoire in the nanny's room. In the event that the parties are unable to agree upon a division, the issue is hereby referred to Family Relations for resolution and recommendation.
 C. Each party shall be entitled to keep the automobile which they are currently driving subject to any liens and/or leasehold interests, free and clear of any claims by the other, and each party shall cooperate with the other regarding the execution of any documentation necessary to transfer and/or register same.
 D. The wife shall be entitled to any net recovery CT Page 3132-ay from the arbitration case pending with the Bank of New York regarding her losses in her investment account as well as any receivables from the her interest in "Portico Kids," free and clear of any claims by the husband.
 E. The wife shall be entitled to keep her Citibank checking account #68882652 and her Putnam Trust Bank account #644-0172995 (both totaling approximately $7200.00) free and clear of any claims by the husband. The husband shall be entitled to keep his Citibank checking account as well as his Citibank accounts #61164703 and #68773915 and his Chase Bank account (all three totaling approximately $68,500.00) free and clear of any claims by the wife.
 F. The Select 10 Fund and the Citibank checking, both currently in joint names shall be divided equally by the parties.
G. As to the following account:
 1. Morgan Stanley Dean Witter active assets account #601 397371: which represents the balance of the net proceeds from the sale of the Greenwich home, shall be divided 70% to the wife and 30% to the husband.
 2. Morgan Stanley Dean Witter active assets account #601017360 which holds in large part the Restricted Paradise Music Entertainment Stock, shall be divided 75% to the husband and 25% to the wife. However, within thirty (30) days of the date of this Memorandum of Decision, the husband, at his sole option, may pay to the wife, in cash, 25% of the balance of said account valued as of the date hereof.
 H. The balance of the wife's security deposit in the initial amount of $11,200, together with any interest accrued thereon, shall belong to the wife free and clear of any claims by the CT Page 3132-az husband.
 I. The husband shall be entitled to retain his Paradise Music, Inc., options free and clear of any claims by the wife.
 8. The husband shall maintain and pay for health insurance for each of the minor children so long as he shall be obligated to pay child support for that child. Un-reimbursed medical, dental, orthodontic, optical, pharmaceutical, psychiatric, and psychological expenses for the minor children, shall be divided by the parties, 50% by the husband and 50% by the wife. The provisions of Section 46b-84 (e) shall apply.
 9. The husband shall promptly notify his ASCAP as to the change of marital status and shall cooperate with the wife in obtaining such continuation health insurance coverage as available. If the wife so elects such coverage, the husband shall be responsible for the payment of any premiums due for such coverage for so long as she is eligible for such coverage, but in no event more than three (3) years. The court shall retain jurisdiction with regard to any issue which may arise herewith.
 10. The husband currently has two life insurance policies in place on his life aggregating $1,400,000 (AIG policy #VL9720116 and Valley Forge Life Ins. Co. policy #VIRE008776). The husband shall maintain so much of either or both life insurance policies which total, at a minimum, $1,000,000, and shall name the wife and minor children as equal beneficiaries thereof for so long as he has an obligation to pay alimony and child support under the terms of this decree. In the event that the alimony is terminated, and he still has an obligation to pay child support, he shall maintain a minimum of $500,000 for each child for so long as his obligation to pay child support is in effect as to that child. Likewise, in the event that the CT Page 3132-ba child support has terminated prior to that of his alimony obligation, the husband shall maintain a minimum of $500,000 of such insurance for the benefit of the wife.
11. The retirement funds shall be divided as follows:
 A. As to the Vanguard 401(k) Plan #092686 [portion of Grey Advertising Retirement]: Shall be the sole property of the husband free and clear of any claims by the wife.
 B. As to the Vanguard ESOP Plan #092687 [portion of Grey Advertising Retirement]: Shall be the sole property of the husband free and clear of any claims by the wife.[3]
 C. As to the Brianhead Pension: Shall be the sole property of the husband free and clear of any claims by the wife.
 D. As to the Edison Schools pension: Shall be the sole property of the husband free and clear of any claims by the wife.
 E. As to Morgan Stanley Dean Witter Account #601 398705: Shall be the sole property of the wife free and clear of any claims by the husband.
 F. As to Morgan Stanley Dean Witter Account #601 405246: Shall be the sole property of the wife free and clear of any claims by the husband.
 G. As to Morgan Stanley Dean Witter IRA Account #601 398608: Effective as of the date of this Memorandum of Decision, 50% of the then balance of the account, which account represents a partial rollover from the Grey Advertising retirement account, together with any interest and/or additions accrued thereon as of the actual date of distribution, shall be transferred to the wife by means of a qualified rollover to a retirement account of her choosing. The wife and her attorney shall be CT Page 3132-bb entitled to any and all information regarding the IRA necessary to effectuate the rollover, including, but not limited to prior and current balances and prior account activity. No withdrawals, distributions, or transfers shall be made from the account except as consistent with this order. The court shall retain jurisdiction to deal with any issues which may arise with regard to the division of this asset.
 H. As to Morgan Stanley Dean Witter active assets account #601 017160: Effective as of the date of this Memorandum of Decision, the entire balance of the account of the husband which represents the John Loeffler Music, Inc. Retirement Plan, together with any interest and/or additions accrued thereon as of the actual date of distribution, shall be transferred to the wife by means of a qualified rollover or a Qualified Domestic Relations Order ("QDRO") if required, which shall be prepared by the attorney for the husband. The wife and her attorney shall be entitled to any and all information regarding the Plan necessary to the preparation and filing of the QDRO, including, but not limited to prior and current balances and prior account activity. No withdrawals, distributions, or transfers shall be made regarding the Plan except as consistent with this order. The court shall retain jurisdiction to deal with any issues which may arise with regard to the preparation and filing of the QDRO and the division of this asset.[4]
 12. Except as otherwise set forth herein, the parties shall each be responsible for the debts as shown on their respective financial affidavits, and they shall indemnify and hold each other harmless from any further liability thereon.
 13. The wife shall be entitled to use the personal exemptions for the children on her state and CT Page 3132-bc federal income tax returns commencing with the tax year 2001.
 14. The husband shall, within fourteen (14) days from the date of this Memorandum of Decision, pay to the attorney for the wife the sum of $25,000 as and for a contribution toward her outstanding attorneys fees and costs incurred in connection with this action. The wife shall be responsible for the balance of any outstanding legal fees and cost incurred by her. The husband shall be responsible for his own attorney's fees without contribution by the wife.
 15. The court hereby orders an Immediate Wage Withholding Order pursuant to Section 52-362
C.G. S in order to secure the payment of the alimony and child support orders.
THE COURT
SHAY, J.